Moncure, P.,
delivered the opinion of the court.
The question to be decided in this case is in regard to the construction of the will of Caleb Stone; another question in regard to the construction of the same will having been decided by this court in the case of Moon & wife v. Stone's ex'or, &c., 19 Gratt. 130-330.
The will bears date on the 27th of January 1807, and was admitted to probate in the county court of Fluvanna county on the 23d of April 1810. The testator left a wife and eleven children, who were the only objects of his bounty in his will, and all of whom were such objects. Six of his children were sons, and five of them were daughters. By the first item of his will he loaned to his wife for her better support, and for the support of his younger childrerí during her natural life or widowhood, the tract of land on which he lived, together with fourteen slaves by name. By the second, third, fourth and fifth items, he gave to his sons and their heirs forever sundry tracts of land, except his son, William Taylor, to whom he had already advanced nearly a thousand dollars, and to whom by the fourth item he gave a negro boy. By the sixth, seventh, eighth, ninth and tenth items he loaned to each of his five daughters one hundred and forty acres of land therein particularly described, on certain terms and subject to certain limitations, which are set out in the sixth item, and are adopted by reference ih the seventh, eighth, ninth and tenth items. The sixth item is in these words :
*3 “6th. I lend to my daughter, Nancy Perry, 140 •acres of land, it being,” &c., “to be possessed by her during her natural life or widowerhood of her present or future husband, and at her death, and the death or after marriage of her husband, then to be equally divided among her children, if she has any, and if she has none, then to be equally divided among all my children.”
The seventh, eighth, ninth and tenth items, loaning the same quantity of land to each of his other daughters are in the same words, mutatis mutandis; the tenth item being in these words:
“10th. I lend to my daughter, Sally, 140 acres of land, it being,” &c., “to be possessed by her and any husband she may have, upon the same terms and conditions as Nancy Perry’s.”
The eleventh item is in these words:
“11th. I lend, to my five daughters each one slave and her future increase, to be possessed by them on the :same terms and conditions as they will hold their lands: that is to say, to Nancy Perry I lend Hannah; to Fanny I lend Joan ey; to Elizabeth I lend Lucy; to Lucy I lend Nelly; and to Sally I lend Phoebe.”
By the twelfth and thirteenth items he made certain bequests to his children, which are not material to be stated here. The fourteenth item is in these words:
“14th. All the rest and residue of my estate, of what kind soever, I give and bequeath to my beloved wife for her support and the support of her children •during her natural life or widowhood, and at her death or marriage my will and desire is, that the same, together with the slaves lent her, shall be equally divided among all of my children, but they are to possess the slaves upon the same terms and conditions as is before mentioned respecting the lands lent to them.”
*4 By the next and only remaining item of the will the-testator nominated the executors thereof.
The controversy in the case of Moon & wife v. Stone’s ex’or &c., supra, was, and the controversy in this caséis, concerning the slave Phcebe and her increase, loaned by the testator, by the eleventh clause of his-will, to his daughter Sally, upon the terms and conditions therein referred to.
It seems that the said Sally Stone was, at the date of her father’s will, not more than ten or twelve years of age; that she died in 1857, about sixty-one years of age, having had no issue, and never having been married, but having left a will which was duly admitted to probate, whereby she made her niece, Christian Stone, who afterwards intermarried with Schuyler R. Moon, her residuary legatee. She received the land and the slave Phoebe loaned her by her father in hi& will, and the living descendants of Phoebe numbered twenty-five in 1857, when Sally Stone died. They have since been sold for a very large sum of money.
After the death of Sally Stone, a suit was brought in the county court of Fluvanna by the surviving-children of Caleb Stone and the personal representatives of such as were dead, for the purpose of having-a sale of the said slaves; and such sale was accordingly decreed to be made. There was also another-suit in the same court, brought for the purpose of having a sale of the said land.
Whilst these suits were thus pending, Schuyler R. Moon and Christian, his wife, filed their bill in the circuit court of said county against the executor of Sally Stone and the other parties in said suits, in which they insisted that by the will of Caleb Stone, Sally took an estate tail in the land and an absolute estate in the slave Phcebe; and that by her will, the *5 -land and the slaves passed to the plaintiff, Christian. They referred to the suits which had been brought for the sale of the slaves and the land; expressed themselves willing that the sale of the slaves should stand, •and to take the purchase money in their stead; and among other things asked for general relief.
The defendants demurred to the bill and answered, -contesting the construction put upon the will of Caleb •Stone by the plaintiffs; insisting that Sally Stone took but a life estate in the property; and that upon her ■death, unmarried and without children, the bequest over to the children of Caleb Stone was valid.
On the 16th of September 1869, the cause came on to be heard, when the court was of opinion that Sally Stone took but a life estate in the slaves under the will of Caleb Stone; and that upon her death, unmarried and without children, they either passed over under the fourteenth clause of the will to the testator’s wife and children, or that both the land and slaves given to Sally Stone passed over to the testator’s children, by virtue of the sixth, tenth and eleventh clauses of the will; that the words of these clauses created neither an estate tail in the land nor a perpetuity in the slaves; and the limitation over was therefore good; and the court sustained the demurrer and dismissed the bill.
From that decree the appeal in the case of Moon & wife v. Stone’s ex’or, &c., supra, was taken. In that case this court held, that under the will of Caleb Stone, his daughter, Sally, was entitled only to a life estate in the land and slave and future increase of the slave loaned to her by the tenth and eleventh clauses of the will; but the court declined to decide who were entitled to the property at her death; considering that the solution of that question belonged to the court in *6 the suits which, it appeared, were depending for a division of the land and slaves, or the distribution of' the proceeds of the sale thereof, among the persons entitled thereto, to which suits the appellants could he made parties if they claimed to be entitled to participate in such division or distribution. And therefore the court affirmed the said decree; but without prejudice to any interest which the said Sally Stone or her representatives might have in the said property or any part thereof, otherwise than under the loan to her as aforesaid.
Accordingly after that decision was made, to wit: in April 1869, John W. Stone, executor of Sally Stone,, filed his petition to the said circuit court in the suit for the division of the said slaves, or the proceeds of the sale thereof, which suit had been removed to the said circuit court from the county court of said county, in which petition he claimed that the remainder after the termination of the life estate of the said Sally Stone in said slaves, vested in all the children of the said Caleb Stone who survived him, either under the express limitation contained in these words, “ to he equally divided among all my children,” contained in the will of Caleb Stone; or, if this remainder was void for remoteness, then by operation of law, and under the statute of distributions; and that all the testator’s, children who survived him were equally entitled; and' that Sally, the life-tenant, being one of them, her representative was entitled to her share; and thereupon the plaintiffs in the suit were summoned to show cause at the next term of the court, if any they could, against the relief sought by said petition.
On the 13th of April 1871 the circuit court decreed' “ that the persons who are entitled to the funds in controversy being the proceeds of the slaves loaned Sally *7 Stone, deceased, for life by ber father, Caleb Stone, are the children of Caleb Stone, who were living at the time of his death, with the exception of Sally Stone; and in case of the death of any of the other children of the said Caleb Stone, that then the personal representatives of such deceased children take their shares.” And the reports of the commissioner were recommitted with certain instructions set forth in the decree.
At the next September term 1871 of said court, to wit: on the 14th of the month, the commissioner having made his report in accordance with said decree, dividing the said fund into ten original shares, and excluding Sally Stone’s personal representative from all participation therein, the court decreed the distribution accordingly.
From the said two decrees of the 18th of April and 14th of September 1871, John W. Stone, executor of Sally Stone, applied to a judge of this court for an appeal, which was accordingly allowed.
The first question which seems to arise for consideration and decision in this case is, whether the executory limitation contained in the will of Caleb Stone, to all his children, of the property loaned by said will to his daughter Sally Stone, is a valid limitation, or void for remoteness.
I am of opinion that it .is void for remoteness. To make an executory limitation valid, the event on which it is to take effect must of necessity happen, if at all, within the duration of a life or lives in being at the time of the creation of the estate, and twenty-one years and ten months thereafter. It is not enough that it possibly may, or even probably will, happen within that period.
Now let us apply that test to this case. Here the *8 property was loaned to Sally Stone, to be possessed by her during her natural life and the natural life or widowerhood of any husband she might thereafter have; and at her death, and the death or after marriage of such husband, then to be equally divided among her children, if she should have any, and if none, then to be divided equally among all the testator’s children.
Sally Stone was very young at her father’s death, not more than about fourteen years of age, and it was very possible for her afterwards to have married a man who was not born at her father’s death, and who might have survived her more than twenty-one years and ten months, at the expiration of which time the executory limitation to the children of the testator would have to take effect if at all. But that period would be too remote, according to the rule before stated.
Then the question is, the limitation being void, what will become of the estate ?
When a specific devise or bequest fails from any cause, the subject of it goes to the residuary devisee or legatee, as the case may be, unless a different intention appears in the will. But when a residuary devise or bequest fails from any cause, the subject of it, to the extent of such failure, goes to the heirs or distributees at law of the testator.
By the residuary clause of the will in this case, the testator gave all the rest and residue of his estate to his wife for her support and the support of her children during her natural life or widowhood, and at her death or marriage his will and desire was that the same, together with the slaves lent her, should be equally divided among all of his children, but they were to possess the slaves upon the same terms and conditions as was in the will before mentioned respecting the lands lent to them; that is, his daughters *9 respectively were to possess their portions of the said slaves during their natural lives, and during the natu■ral lives or widowerhoods of any husbands they or might have, and at their deaths, and the deaths or after marriages' of any such husbands, then to be equally divided among their children, if any, and if none, then to be divided equally among all the testator’s children.
Except, therefore, to the extent of an estate given to his wife for her support and that of her children, during her natural life or widowhood, all his children are his residuary devisees and legatees—his daughters in regard to the said slaves upon the terms ■and conditions aforesaid.
Now it is very obvious that the testator intended this residuary clause to be of very limited operation. He had a large family, consisting of a wife and eleven ■children, for each of whom he provided generally in separate items of his will, commencing with his wife, and continuing through with all of his children, disposing apparently of all his land and slaves and some of his perishable property, particularly by name and description; and having written the first thirteen items •of his will, he had then only to dispose of any residuum there might be of his estate, and nominate his •executors, which he did by the last two items of the will. The residuum to be disposed of consisted mainly of the remainder in the slaves, which by the first item he had loaned to his wife for her better support and the support of his younger children during her natural life or widowhood, and consisted further no doubt of some articles of personal property of no great value, which had been omitted or not disposed of in the prior items of his will. By the fourteenth or residuary item he gave “ all the rest and residue of his estate, of *10 what kind soever” (meaning thereby no doubt the artioles of personal property aforesaid, and certainly not to embrace in the words describing the subje°t of the gift, though they were as comprehensive in their natural meaning as possible, the said remainder in , , , j= % x ’ the slaves loaned to his wife), “for her support and the support of her children during her natural life or widowhood, and at her death or marriage” his will and desire was, “that the same, together with the slaves lent her,” should be equally divided among all of his children, but they were “to possess the slaves upon the same terms and conditions as is before mentioned respecting the lands lent to them.”
The interest provided by the testator for his wife, in the residuary item of his will, was limited and temporary only, and ending with her life or widowhood. The record does not inform us at what time it ended. The testator could not have expected it to continue long. If' she was the mother of the eleven children provided for by the will, she must have been quite an old woman at its date. We do not even know that she was living at his death, which seems not to have occurred until several years after the will was written. He could not have contemplated to embrace in this residuum, given for this temporary and immediate purpose, a subject which might at a remote day happen to revert to his estate by the unexpected effect of an executory limitation contained in his will. If it appears from the will,, construed with reference to the surrounding circumstances, that he did not intend to embrace that subject in the residuum, then he died intestate as to that subject, and it devolved upon his next of kin at his death, who were his eleven children, of whom the testatrix of the appellant was one.
But if that subject is embraced in the residuum,. *11 what then ? It is directed by the residuary clause to be equally divided among all of his children. Who were all of his children? All of the eleven before mentioned? or only such of them as might happen to be living at the period fixed for division? But when did that period arrive? Before or after the death of the testator? and if after, how long? All this was unknown to the testator when he made his will, and he could not have supposed that it would occur long after his death. He must therefore have used these words: “ All of my children,” in their plain literal sense, and intended to embrace all who were living at his death, and not to exclude the families of those who might die after the death of the testator and before the period of division, leaving children. The concluding words of the item, “but they are to possess the slaves upon the same terms and conditions,” &c., cannot affect the question. If they could have any effect at all, had thgy been used in reference to the subject aforesaid, they were not so used, but only in reference to the slaves loaned to his wife for life or widowhood by the first item of the will.
But let us suppose that I am wrong in the opinion that the executory limitation aforesaid is void for remoteness. Suppose that it is valid. And now let us enquire who, on that supposition, was entitled, in the event which actually happened, to participate in the division of the said subject, under the words of the will directing it, in that event, “ to be divided equally among all my children ?” Who are the children here referred to? The children living at the testator’s death, or the children that might be living at the uncertain future period of division? And if the former, is Sally Stone to be considered as one of the children,. *12 and is her personal representative entitled to partici- . . .. ,. . . _ pate m the division r
The court, below decided and decreed that the death of the testator is the period to which the said words of M8 wiH refer. But that Sally Stone herself is not-embraced in these words according to their proper construction in this ease, and therefore that her personal representative is not entitled to participate in the division.
I think the court was right in the first branch of its decision, to wit: that the death of the testator is the period to which the said words of his will refer; but erred in the latter branch of it, to wit: that Sally Stone herself is not embraced in those words, and that her personal representative is not entitled to participate in the division.
The testator knew who were his children at the date of his will and at his death. Probably all he ever had were then still alive. He could not know who would be his children at a remote future period, which turned out in regard to the subject in controversy to be forty or fifty years after his death. He could not know how many of his children would then be dead, or what issue, if any, they might leave; and he could hardly have intended to cut off such issue from any participation in the future divisions contingently provided for by his will. When therefore he used the most comprehensive words which the English language would afford in describing the class of persons who were to take, and directed the subject to be divided equally “ among all his children,” the fair presumption is, that he intended to embrace as many as the words’ would embrace, and to include all who were alive at his death.
*13 This construction is fortified by the rules of law, by the words of the gift, and by the context of the will, and is not inconsistent with any of the surrounding circumstances of the case so far as appears from the record.
It is a rule of law, that an estate or interest given by a will generally vests as soon as it may, consistently with the words used in giving it. This general rule is subject to an exception when it appears from the context of the will and the surrounding circumstances that the intention of the testator, as expressed by the words of his will was otherwise. The words, we have seen, are as comprehensive as possible. We have no reason to believe they were not used in their literal sense. On the contrary, we have reason, as is already shown, for believing that they were in fact used in such sense. If they had not been intended to be so used, nothing was easier than to have expressed such intention. The words, “then living,” added to the sixth item, would have clearly fixed the period of the division, instead of the death of the testator, as that at which the persons who were to constitute the class among which the division was to be made were to be ascertained. The context of the will supports the construction referred to, even in regard to embracing Sally Stone herself, or her personal representative, as one of those among whom the division is directed to be made. We find that there are five clauses in the will in which the same language is used, or adopted by reference, in regard to such a division. The testator gives the same direction in regard to the property loaned to each of his five daughters. He could hardly have intended that the personal representative of each of these daughters might share in the division of the property loaned to each of the others but not in the *14 division of that loaned to herself—as would be the ease according to the construction adopted by the court below.
The principles of law involved in the foregoing views are so well settled, that it is hardly necessary to refer to cases in support of them, many of which were cited in the argument. There is much apparent conflict in the cases, but it will be found on examination to arise mainly from the peculiar circumstances of each case. All agree in this, that the intention of the testator, as shown by his will, must prevail if legal. And the question in each ease is, what was such intention?
In 2 Jarm. on Wills, 58 marg., the writer, after stating the general principle that the testator’s death is the period for ascertaining the persons belonging to a class of objects of his bounty, thus proceeds: “The same construction prevails, though the tenant for life, at whose death the distribution is to be made, is himself one of the next of kin,” to whom the property is limited. “As, where a testator bequeathed £5,000 in trust for his daughter for life, and after her decease for her children, living at her decease, in sucb shares as she should appoint; and in case°she should leave no child, then as to £1,000, part thereof, in trust for the executors, administrators and assigns of the daughter; and as to £4,000, the remainder, in trust for the person or persons who should be his heir or heirs at law. The daughter died without leaving children. She, and two other daughters, were the testator’s heirs at law.. Sir II. P. Arden, M. E,., held the heirs, at the time of the testator’s death, to be entitled, from the absence of expression, showing that these words were necessarily confined to another period, which, he said, required something very special.”
*15 In 2 Redfield on Wills, edition of 1876, page 92, that writer says: “In the case of Pearce v. Vincent, 2 Mylne & K. 800, the tenant for life was also nearest kin at the death of the testator, to whom the estate # was, in the event of his decease without appointment, directed to go; and the court of exchequer, 1 Cromp. & Mees. 598, to whom the case was first sent for advice, were of opinion there was no inconsistency in supposiug the testator might have intended the same person both for tenant for life and in remainder. But the opinion was not satisfactory to the master of the rolls, and the case was sent to the common pleas, 2 Bing. N. C; 328, who concurred in opinion with the court of exchequer; and Lord Langdale, the master of the rolls at the period for the final determination of the case, concurred in opinion with the courts of law, and gave judgment accordingly. 2 Keen 230.” In a note to the same page of the same work the writer says: “ The case of Urquhart v. Urquhart, 13 Simons 613, holds the same view. The cases are here extensively reviewed by the vice chancellor, Sir L. SkadweU. And the same rule is adopted by the same learned judge in Nicholson v. Wilson, 14 Simons 549, upon the authority of Masters v. Hooper, 4 Br. C. C. 207, saying : ‘ The argument for the plaintiff in this case was founded entirely on conjecture; but conjecture does not authorize the court to depart from the plain meaning of the words which are found in the will. And the same rule substantially was applied in the case of Seifforth v. Badham, 9 Beav. R. 370, by Lord Langdale, M. R. And in Baker v. Gibson, 12 Beav. R. 101, the same learned judge considered the rule so fully settled in that decision, that he would not allow the bill to be amended with a view to open it anew. So that the law in England is now regarded as fully settled.’” *16 The writer then proceeds to criticise to some extent the course pursued by the English courts.
See also 2 Lomax on Executors, p. 47, and the cases cited in the notes.
Bird v. Luckie is a case which was referred to in the argument, as were most of the cases and books before referred to. It was a decision of Knight Bruce, V. C. (sitting for Wigram, V. C.) and reported in The Jurist,, vol. 14, p. 1015. It is an exceedingly interesting case,, very pertinent to the one now under consideration, and strongly sustaining the views I have before presented. But I will only repeat here the concluding words of the opinion : “ Therefore I must read ‘ next of' kin’ as meaning next of kin at the testator’s death—a conclusion at which I have arrived not very willingly, its effect being to take the bulk of his property from his family in a manner that it may be fairly conjectured he would himself be disposed to prevent if he could have a voice in the matter; but we are allowed to hear him only through his will and codicil.”
Bullock v. Downes is another case which was referred to in the argument, and is more recent and still more important, as it was a decision of the House of Lords, in which the law-lords, or most of them, delivered seriatim opinions, and were unanimous. The case is reported in 9 House of Lords Cases, p. 1, and was decided in 1860. The case was this: A. D., after specific bequests to different members of his family, gave the residue to three persons in trust to pay the dividends to his son for life, and after the son’s decease, to pay to any widow of the son (who was not then married) an annuity of £600 for life, and the residue to his son’s children, and in case there should not be any child of the son, “ then to stand possessed of the same in trust for such person or persons of the blood of me as *17 would by virtue of the statute of distributions of intestate^ effects have become and been then entitled thereto in case I had died intestate.” At A. D.’s death he left the son and four daughters him surviving. The son married, enjoyed the dividends of the residue during life, and died without ever having had a child. It was held that the word “ then,” even if treated as an adverb of time, referred only to the time when the persons entitled would come into possession of what had been bequeathed to them; that the persons entitled were to be ascertained at the death of the testator; that the son was one of those persons, and that his right, as one of the next of kin, was not affected by the previous gift of a life-interest in the whole of the residue, so that on the death of the son without issue the residue became divisible into five shares, of which his personal representative took one, and his sisters the other four. The opinions delivered in the case are very interesting, but I will not prolong this opinion by repeating any portion of them.
Abbott v. Bradstreet &c., 3 Allen 587, also cited by the counsel for the appellant, was decided in 1862, and is an important case to the same effect; but I will not state it more fully here.
Two cases were cited by the same counsel from our own reports, which strongly support the same principle. They are Hansford v. Elliott, 9 Leigh 79; and Martin, adm’r, v. Kirby, adm’r, & als., 11 Gratt. 67.
In Hansford v. Elliott, a testator, after bequeathing the residuum of his estate to his wife during life or widowhood, bequeathed that the whole of his personal estate, at the death of his wife, should be equally divided among bis surviving children thereinafter named, (naming five), and in case his wife should then be with child, that child should have an equal part of his *18 sonal estate with the rest of his children before named: ■ Held, that the word surviving refers to the death of the not that of tenant for life, and so children of testator who survived him, but did not survive tenant for ^ ’ J life, took vested interests in remainder. Words of survivorship, in such cases, are always to be referred to the period of the testator’s death, if no special intent appears to the contrary.
In Martin, adm’r &c. v. Kirby, adm’r &c. & als., it was held that in a devise or bequest over to survivors at the death of a devisee or legatee for life, in the absence of the expression of a particular intent on the part of the testator, the survivorship has relation to the death of the testator.
Upon the whole, I am of opinion that the words, “ All my children,” in the will of the testator, Caleb Stone, mean “all my children living at my death;” that the said children of the testator, living at his death, including Sally Stone, or the survivors of them, and the personal representatives of such of them as are dead, including the personal representative of the said Sally Stone, are entitled to the funds in controversy, being the proceeds of the slaves loaned to her for life by her said father; that so much of the decrees appealed from, as- is in conflict with the foregoing opinion, is erroneous and ought to be reversed and annulled; and that the cause ought to-be remanded to the said circuit court, to be further proceeded in to a final decree in conformity with the said opinion.
Decree reversed.